Timothy A. Gambacorta
AZ Bar No. 028460
IL Bar No. 6279115
Counsel for the Plaintiff

The Gambacorta Law Office, Inc.
5250 Old Orchard Road, Suite 300
Skokie, Illinois 60077
Tel: 847-786-2599
Fax: 847-786-2612
Email: tim@gambacortalaw.com

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| MAUI HOPE, | A-File No. 240-079-847 |
| Plaintiff, | |
| vs. | |
| **EMBASSY OF THE UNITED STATES, DUSHANBE**; **JOHN DOE**, in his official capacity as Nonimmigrant Visa Chief of the U.S. Embassy in Dushanbe, Tajikistan; **JANE DOE**, in her official capacity as Nonimmigrant Visa Chief of the U.S. Embassy in Dushanbe, Tajikistan; **JOHN DOE**, in his official capacity as Consular Officer of the U.S. Embassy in Dushanbe, Tajikistan; **JANE DOE**, in her official capacity as Consular Officer of the U.S. Embassy in Dushanbe, Tajikistan; **MANUEL MICALLER, JR.**, in his official capacity as U.S. Ambassador to Tajikistan; **MARCO RUBIO**, in his official capacity as Secretary of State of the U.S. Department of State; and **THE UNITED STATES OF AMERICA**, | Agency Case Nos.: IOE8518935460 |
| | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Defendants. | |

# INTRODUCTION

1.      Plaintiff, MAUI HOPE ("Maui Hope" or "Plaintiff"), a not-for-profit organization represented here by its co-founder and Executive Director Ms. Andrea Rodgers ("Ms. Rodgers"), by and through its attorney, The Gambacorta Law Office, Inc., now brings this action to review the merits of a consular officer's denial of a visa for constitutional error since Plaintiff's visa application was denied without a "facially legitimate and bona fide reason[.]" *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972).

2.      On January 26, 2023, the not-for-profit organization Maui Hope filed Form I-129, Petition for a Nonimmigrant Worker ("Petition"), on behalf of Beneficiary Mr. Shavkat Hoshimov ("Mr. Hoshimov"). On February 1, 2023, the Petition seeking to classify Mr. Hoshimov as an H-1B nonimmigrant was approved by the United States Citizenship and Immigration Services ("USCIS").

3.      Pursuant to this approved Petition, on April 4, 2023, Mr. Hoshimov appeared for an H-1B visa interview at the U.S. Embassy in Dushanbe, Tajikistan.

4.      At this interview, the interviewing consular officer denied Mr. Hoshimov's nonimmigrant visa application on the alleged basis that Mr. Hoshimov was inadmissible under the Immigration and Nationality Act ("INA") § 212(a)(6)(C)(i) for allegedly "us[ing] fraud or misrepresentation in obtaining a visa or entry into the United States."

5.      The consular officer's denial was based in both misunderstanding of the law and of the factual circumstances surrounding Mr. Hoshimov's previous activities

in the U.S. on his B1/B2 visitor visa, despite Mr. Hoshimov's insistence that he only ever engaged in authorized activities on his visitor visa, never worked without permission, and never received any compensation from any source for anything that could be considered work or employment.

6.     Moreover, the denial contends that Mr. Hoshimov committed fraud or misrepresentation under INA § 212(a)(6)(C)(i), indicating that the consular officer decided that Mr. Hoshimov had actively intended to present fraudulent information or withhold key information specifically for the purpose of obtaining an immigration benefit. Mr. Hoshimov provided no facts or made any statements during his interview or at any other time that would justify such an assertion.

7.     Therefore, on the basis of this unjust denial, Plaintiff Maui Hope asserts that the consular officer denied its prospective employee Mr. Hoshimov's nonimmigrant visa application in bad faith because it was denied without a "facially legitimate and bona fide reason[.]"

## **PARTIES**

8.     Plaintiff Maui Hope is a not-for-profit organization based in Maui, Hawaii that filed a Petition on behalf of Beneficiary Mr. Hoshimov seeking to classify him as an H-1B nonimmigrant. Maui Hope's right to have Mr. Hoshimov work as a Service Manager for the benefit of the community has been impeded by Defendants' unconstitutional refusal to issue Mr. Hoshimov an H-1B visa.

9.      Beneficiary Mr. Hoshimov is a citizen of Tajikistan. He carries academic degrees that certify him to work as a Service Manager. His right to work for a not-for-profit organization founded to aid individuals with special needs is impeded by the Defendants' unconstitutional refusal to issue Mr. Hoshimov an H-1B visa.

10.     Defendant Embassy of the United States in Dushanbe, Tajikistan (hereinafter sometimes referred to as "the Dushanbe Embassy"), is a component of the Department of State that is responsible for processing nonimmigrant visa applications and implementing the immigrant and non-immigrant visa provisions of the law. Mr. Hoshimov's visa was denied at the Dushanbe Embassy.

11.     Manuel Micaller, Jr., is the U.S. Ambassador to Tajikistan. He supervises the Dushanbe Embassy that denied Mr. Hoshimov's visa application.

12.     Defendant John or Jane Doe is the Nonimmigrant Visa Chief of the Dushanbe Embassy. Defendant Doe approves or denies consular officers visa determinations.

13.     Defendant John or Jane Doe is a consular officer with the Dushanbe Embassy. Consular officers are vested with the power to issue or refuse visas. Defendant Doe denied Mr. Hoshimov's visa application.

14.     Defendant Marco Rubio is the U.S. Secretary of State, responsible for supervising all consular functions, including the issuance of visas.

15.     All government defendants are sued in their official capacities.

## JURISDICTION AND VENUE

16.     The Court has jurisdiction to hear this case under 8 U.S.C. § 1101 et. seq. [Immigration and Nationality Act], 28 U.S.C. § 1331 [Federal Question Statute], and 5 U.S.C. § 701 et seq. [Administrative Procedure Act]. This Court also has jurisdiction under 28 U.S.C. § 2241 [Power to Grant Writ]. The doctrine of consular nonreviewability does not strip this Court of jurisdiction.

17.     Venue is proper in this District under 28 U.S.C. §1391(e)(1)(A) because Defendants are a U.S. agency and officers of a U.S. agency acting in their official capacity or under color of legal authority and a Defendant in this action resides within this district.

## STANDARD OF REVIEW

18.     The Administrative Procedure Act provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. 5 U.S.C. § 704. Any person "suffering legal wrong" or "adversely affected or aggrieved by agency action" may bring an action in federal court for "relief other than money damages," *Id.* § 702.

19.     According to § 702, any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" is entitled to judicial review. A U.S.-citizen-owned-and-operated nonprofit organization is clearly "suffering a legal wrong" and is "adversely affected or aggrieved" when a consular officer arbitrarily denies a non-immigrant visa to an eligible, qualified, prospective employee.

20.     That said, the fact that administrative review of consular decisions is not reviewable does not mean judicial review is foreclosed. The Court in *Mandel*, *supra*, at 769-70 recognized a narrow exception for review of constitutional claims. The exception itself is quite narrow, requiring deference to the consular officer's decision so long as "that reason was facially legitimate and *bona fide*." *Id.*, at 769.

21.     The facially legitimate and *bona fide* reason test has two components. First, the consular officer must deny the visa under a valid statute of inadmissibility. *See Kerry v. Din*, 576 U.S. 86, 135 S. Ct. 2128, 2140-41 (2015). Second, the consular officer must cite an admissibility statute that "specifies discrete factual predicates the consular officer must find to exist before denying a visa," or there must be a fact in the record that "provides at least a facial connection to" the statutory ground of inadmissibility. *Id.* Once the government has made that showing, the plaintiff has the burden of proving that the reason was not *bona fide* by making an "affirmative showing of bad faith on the part of the consular officer who denied" a visa. *Id.*

22.     The Court in *Matushkina v. Nielsen*, 877 F.3d 289, 294 (7th Cir. 2017) held that the doctrine of consular nonreviewability "is not absolute," and allows for judicial review in at least two circumstances: (1) the court "may conduct a limited review to determine whether a visa was denied for a *bona fide* and facially legitimate reason;" and (2) "review may also be permitted where denial of an alien's application affects a U.S. citizen's constitutional rights").

## FACTUAL ALLEGATIONS

**Mr. Hoshimov's Background and U.S. Travel History**

23.    The Department of State ("DOS") has issued Mr. Hoshimov a number of nonimmigrant visas for his travels to the U.S. between the years 2007 and 2022. *See* **Exhibit C**, <u>Declaration of Mr. Hoshimov</u> at ¶ 5. From March 15, 2007 to December 26, 2011, he received and maintained four (4) consecutive F-1 student visas, and from September 15, 2014, to November 26, 2020, he received and maintained no less than seven (7) consecutive B1/B2 Visitor Visas issued by the Dushanbe (Tajikistan) and Dubai (United Arab Emirates) U.S. embassies. *Id.* at ¶ 70.

24.    During each of the visa interviews held at the Dushanbe or Dubai embassies, Mr. Hoshimov firmly maintains that he was always forthcoming as to the nature and purposes of his travel to the U.S. *Id.* at ¶ 71.

25.    On his first trip to the U.S., Mr. Hoshimov lawfully maintained F-1 Student Visa status while he enrolled as a student at Camphill Academy in Glenmoore, Pennsylvania, in 2007 and later worked at the Academy in lawful F-1 OPT (Optional Practical Training) status. *Id.* at ¶ 5. Camphill Academy is a professional education center offering Anthroposophic Curative Education and Social Therapy for individuals in need. *Id.* It was here he, in his own words, "worked with over 100 students with disabilities, which included offering help and advice to the parents of students with extremely challenging behavior." *Id.* at ¶ 92.

26.    It was in 2008 during his time at Camphill Academy that Mr. Hoshimov first met Ms. Rodgers and her son, Ian Joya ("Ian"). *Id.* at ¶ 14. Ian exhibits "challenging behavior" as an adult with autism, and Mr. Hoshimov worked closely with him and on one occasion accompanied him on a flight to his parents' home in Hawaii during school during a holiday break. *Id.* Mr. Hoshimov came to know and develop close bonds with Ian and his family during these years. *Id.* at ¶ 15.

27.    In 2011, Mr. Hoshimov graduated from Camphill Academy as a Certified Special Educator in the field of Special Education and Social Therapy. *Id.* at ¶ 6. In 2012, he graduated with a Bachelor of Arts in Education from Prescott College, in Prescott, Arizona. *Id.* at ¶ 59.

28.    A few years after graduating, Mr. Hoshimov, applied for his first U.S. B1/B2 visitor visa in 2014 so that he could escort his former student to the U.S. from Dubai upon the request of the student's mother. *Id.* at ¶ 71. The costs of travel were covered by the student's mother, and this information was given to the U.S. embassy at the time of the application and the interview. *Id.* Mr. Hoshimov also told the U.S. embassy about his plans to visit and travel in the U.S. after dropping off his former student. *Id.* at ¶ 72. He did this for each subsequent visitor visa interview, fully explaining the purpose of his trip and any additional plans he had to visit friends or travel in the U.S. *Id.* Each time, the DOS issued him a visa.

29.    Over the years, Mr. Hoshimov kept in contact with Ian and his parents, eventually visiting them again after 10 years in 2018 for a 9-day stay in Hawaii. *Id.* at ¶

16. He became aware that Ms. Rodgers, who was the Executive Director of La'akea Village on Maui at the time, was planning to establish a program in Maui to support the needs of her son using Camphill Academy as a model. *Id.* at ¶ 17. Near the end of 2020 or beginning of 2021, Ms. Rodgers told Mr. Hoshimov that she had bought a property in Hawaii with plans to build a home for residents with special needs like her son. *Id.*

30.    Around that time, Mr. Hoshimov had planned once again to accompany his former student from Dubai to the U.S. *Id.* at ¶ 18. Afterward, he planned to visit Ian and his family in Hawaii for another short stay. *Id.* at ¶ 23. However, this original plan fell through once his former student's mother wanted to wait until after certain COVID-related travel restrictions had been lifted. *Id.*

31.    So instead, in March of 2021, Mr. Hoshimov once again visited Ian and Ms. Rodgers in Hawaii on his visitor visa and stayed in a private residence that was owned by Ms. Rodgers and her husband. *Id.* at ¶ 19. The residence was and continues to be unaffiliated with Maui Hope.

32.    The purpose of Mr. Hoshimov's stay was tourism, sightseeing, and visiting with friends – all well within the bounds of his B1/B2 visitor visa. During his stay, he had also noticed that Ian's Personal Care assistants were having difficulties in providing the environment Ian needed. *Id.* at ¶ 20. He communicated with the assistants about how to better interact with Ian, but he was not employed or compensated for this in any way. *Id.*

33.     Thus, in this small way, Mr. Hoshimov was able to help Ian and his family with Ian's transition, echoing the spiritual and humanitarian principles of anthroposophy championed by Camphill—in this case, selflessly helping individuals with disability without the motivation of a financial reward. *Id.* at ¶ 22. By the time of his visit to Hawaii, Mr. Hoshimov had already displayed his adherence to these principles in his interactions with others, such as in the trips he would take with his former student from Dubai. *Id.*

34.     After leaving the U.S., Mr. Hoshimov planned another visit to the U.S. to Hawaii on January 18, 2022. *Id.* at ¶ 24. On this trip, he arrived by commercial airplane to Los Angeles Airport on a valid B1/B2 visitor visa, which was to remain valid until February 10, 2022. *Id.* at ¶ 6.

35.     At that time, the Customs and Border Protection officers placed Mr. Hoshimov into secondary inspection and questioned him about the nature of his prior entry to the U.S. from March 23 to September 22, 2021. *Id.* The officer asked a number of questions related to Maui Hope and Mr. Hoshimov's activities during his last trip to Hawaii of about five months. *See* **Exhibit I**, <u>Record of Interrogation</u>.

36.     Mr. Hoshimov attested to the fact that he never received any monetary compensation for his time at Maui Hope. *Id.* He was given lodging at Ms. Rodgers and her husband's private residence and was able to use their private vehicle for transportation, but had to pay for the gas himself. *Id.* On occasion, he ate with them for free as a guest. *Id.* These facts were distorted by the officers during the interview

by characterizing the car as a "company car' and making reference to the Maui Hope "facility" where no facility has ever existed. *Id.*

37.     The officer asked Mr. Hoshimov if he was aware that receiving any form of compensation for services is considered employment in the U.S., to which Mr. Hoshimov agreed he understood. *Id.* By this, he was referring to the general knowledge he had of this fact, but was not agreeing that he had engaged in employment by that definition.

38.     By the time he was being interviewed, Mr. Hoshimov had been awake for over 36 hours and was feeling sleep-deprived and exhausted. **Exhibit C**, *supra* at ¶ 24. After he had the chance to review the sworn statement later, Mr. Hoshimov notes that there were many pieces of the conversation that were not recorded or that some of his answers were taken out of context. *Id.* Overall, he feels his answers were not properly recorded and that—according to how they were recorded—his answers failed to explain the situation clearly. *Id.*

39.     One strong example of this noted by the Plaintiff is that Maui Autism Center, which is a completely separate entity from Maui Hope that Mr. Hoshimov never visited, never received any funding to purchase a live-in facility called Maui Hope. *See* **Exhibit E**, *Statement of the Plaintiff* at ¶ 6. Ms. Rodgers was also never the CEO of Maui Autism Center, though she did independently develop the Maui Hope program – which is not a "live-in facility" or even a facility at all. *Id.* These facts directly

contradict the interrogation statement, which supports an entirely different narrative than the truth. *Id.*

40.     Additionally, Mr. Hoshimov was later made aware of additional details about Maui Hope after his interview. **Exhibit C**, *supra* at ¶ 25. Specifically, he learned from Ms. Rodgers that Maui Hope was not even contracted as a Hawaii Department of Health licensed agency until February of 2022. *Id.* at ¶ 27. In 2021, there were no employees, no clients, and no Department of Health contract. Seen in this light, it is even more clear that Mr. Hoshimov's stay with the Rodgers family was not pursuant to any type of employment. *Id.*

41.     In addition, the personal care assistants that Mr. Hoshimov interacted with were not even employed by Maui Hope at the time (since it didn't exist), but were instead from a separate company called Acumen, covered by Medicaid Services. *Id.* at ¶ 28. Moreover, Mr. Hoshimov was not Ian's caretaker, as Ian had two live-in roommates who did that work, caring for him five days a week. *Id.* Ian received 15 hours per day of one-on-one support services from Acumen (not Mr. Hoshimov), and it wasn't until July of 2022 that he received services from Maui Hope. *Id.*

42.     Mr. Hoshimov notes that the officers misinterpreted his statements and added phrases that inaccurately represented his time in Hawaii. For example, he did not say that his role was to "help train the staff" at Maui Hope. *Id.* at ¶ 34. The officers also called Maui Hope a "live-in" facility, even though Mr. Hoshimov never described it as such. *Id.* Regardless, Mr. Hoshimov never meant to indicate that he worked or

intended to do work as a trainer, as it was not the case. *Id.* Moreover, he does not recall saying that the car he used was a "company car", even though that is the phrase the officer used in the sworn statement. *Id.* at ¶ 47. Mr. Hoshimov notes that the car was a vehicle that Ms. Rodgers bought and owned privately and allowed him to use. *Id.*

43.   Mr. Hoshimov notes other inaccuracies in the sworn statement, such as the fact that he never suggested to them that Maui Hope was established in 2018. *Id.* Maui Hope did not exist until 2022, and in 2018 Ms. Rodgers was employed by a separate company called La'akea Village. at ¶ 36. Mr. Hoshimov also wanted to make the record clear that he paid Ms. Rodgers back in cash for the ticket from Los Angeles to Maui, and that she never paid him for a ticket from his home country to Los Angeles. *Id.* at ¶ 37. He also corrects the record by stating that he never had a "20-hours per week schedule at Maui Autism Center", despite the information listed on the sworn statement. *Id.* at ¶ 47. The officers also incorrectly used the word "client" to describe Mr. Hoshimov's relationship to Ian, which was not a true reflection of his situation. *Id.* at ¶ 45.

44.   Additionally, the border officers incorrectly put that Mr. Hoshimov told them that Ms. Rodgers was the CEO of Maui Autism Center, which he did not say and is not true in any sense. *Id.* at ¶ 38. Maui Autism center was one hour drive away from where Mr. Hoshimov was staying and he never once visited the Center. There would also be no reason for him to do so, as the Autism Center is a medical facility that provides Occupational and Speech Therapy and the staff are paid through medical

insurance – HIPAA regulations would have prevented Mr. Hoshimov's involvement there even as a volunteer (let alone as an employee). In other areas of his statement, Mr. Hoshimov notes that the officers shortened his responses or outright changed them from what he told them during the interview. *Id.* at ¶ 40. This is the case for the response on his sworn statement that indicated he would shop for "the residents", when in reality, there were no "residents" since Maui Hope did not exist in any way, shape, or form. When he purchased food from the local store for himself and with his own money, he happily shared it with his hosts. *Id.* at ¶ 45.

45.    Plaintiff Ms. Rodgers affirms these many details in her personal statement, elucidating the fact that Mr. Hoshimov was not directly involved—if he was involved at all—in the details of Maui Hope as it was forming and being renovated. **Exhibit E**, *supra* at ¶ 16. He was considered their houseguest, and they did not even discuss his potential employment at Maui Hope until "well after the non-profit became operational in February 2022, and began growing and taking on more clientele." *Id.* at ¶ 17.

46.    Per Plaintiff, the intended purpose of Mr. Hoshimov's visit in January of 2022 was completely social. *Id.* She had even prepared an invitation letter from herself and Maui Autism Center attesting to his good character, which was ignored by the border officer. *Id.* She attests to the fact that Mr. Hoshimov planned to pay her back the price of the plane ticket when he arrived, further that no gifts or exchanges were

given to him for his trip – and especially none that would count and compensation for employment. *Id.* at ¶ 18.

47.    Despite all of the above, the border officers concluded the sworn statement by asking Mr. Hoshimov if he was aware that engaging in unauthorized employment was a violation of B1/B2 status—to which he replied "yes", as he understood the implications of unauthorized employment—and then more directly asked him why he engaged in unauthorized employment. **Exhibit I**, *supra*. Mr. Hoshimov naturally denied engaging in any kind of employment during his time in the U.S. *Id.*

48.    After the lengthy interrogation, Mr. Hoshimov's entry was denied and his visa was revoked. *Id.* However, importantly, the officer only revoked his visa under INA § 212(a)(7)(A)(i) [non-possession of valid entry document], stating that Mr. Hoshimov had been honest and forthcoming with his statements, and did not find him inadmissible under INA § 212(a)(6)(C)(i) for fraud or willful misrepresentation. **Exhibit C**, *supra* at ¶ 56.

**The Visa Interview**

49.    Subsequent to this denial of his entry, Ms. Rodgers and Mr. Hoshimov discussed what a potential employment arrangement would look like. She eventually filed for an H-1B visa for Mr. Hoshimov on behalf of Maui Hope, so that Mr. Hoshimov could come to the Hawaii and work with the newly-founded organization as its Service Manager. *Id.* at ¶ 77.

50.    So, on January 26, 2023, the not-for-profit organization Maui Hope filed Form I-129, Petition for a Nonimmigrant Worker ("Petition"), on behalf of Mr. Hoshimov, and on February 1, 2023, the Petition classifying Mr. Hoshimov as an H-1B nonimmigrant was approved by the United States Citizenship and Immigration Services ("USCIS").

51.    Pursuant to this approved Petition, On April 4, 2023, Mr. Hoshimov appeared for an H-1B visa interview at the U.S. Embassy in Dushanbe, Tajikistan.

52.    At this interview, the interviewing consular officer denied Mr. Hoshimov's nonimmigrant visa application on the alleged basis that Mr. Hoshimov was inadmissible under the Immigration and Nationality Act ("INA") § 212(a)(6)(C)(i) for "us[ing] fraud or misrepresentation in obtaining a visa or entry into the United States." *See* **Exhibit A**, Refusal Notice.

53.    However, Mr. Hoshimov did not receive a written explanation of the factual basis for this denial on the day of the interview, nor was this information explained to him by the consular officer. *Id.* at ¶ 79. Instead, he had to go through Hawaii State Senator Hirono's office to obtain this information, which he finally received over a month later on May 9, 2023. *Id.* The response from the Department of State, however, was lacking in information and only indicated once again that he was found to be inadmissible under INA § 212(a)(6)(C) for willful misrepresentation (citing 9 FAM 302.9). *Id.* at ¶ 80.

54.    On May 12, 2023, after Mr. Hoshimov's attorney sent a letter of reconsideration to the U.S. Embassy, he was told that "[t]he consular officer found that Mr. Hoshimov made a willful, material misrepresentation – he stated that he intended to engage on B-1/B-2 qualifying activities at the time of his admission on March 23, 2021 - when he actually intended to engage in unauthorized employment." *Id.* at ¶ 81.

55.    Mr. Hoshimov and Ms. Rodgers attempted further communication with their congressional representatives and the U.S. Embassy in Dushanbe. On October 22, Ms. Rodgers received an email from Congresswoman Jill Tokuda which indicated that the "Department of State maintains that [Mr. Hoshimov]'s service with [Maui Hope] amounted to work while in the U.S. on a tourist visa." *Id.* at ¶ 84. The communication further indicated that Mr. Hoshimov was permanently inadmissible under INA § 212(a)(6)(C) for willful misrepresentation and would require a waiver of this inadmissibility before he could lawfully obtain any form of status. *Id.*

56.    Now with all the available information, it is clear to Plaintiff Maui Hope, Mr. Hoshimov, and undersigned counsel that the embassy's denial of Mr. Hoshimov's visa on April 4, 2023, was not only an overstep, but was arbitrary, capricious, an abuse of discretion, and not in accordance with the law.

## On "Unauthorized Employment"

57.    Under 8 C.F.R. § 247a.1(h), employment is defined as "any service or labor performed by an employee for an employer within the United States." However,

this definition "does not include casual employment by individuals who provide domestic service in a private home that is sporadic, irregular or intermittent." 8 C.F.R. § 247a.1(h).

58.    As such, the assertion by the interrogating officer at the border that employment is "any…type of services in which [one] receive[s] compensation" is incorrect as a matter of law. Moreover, it does not reflect the reality of the nature of Mr. Hoshimov's visit and is therefore entirely the officer's opinion.

59.    Mr. Hoshimov was not employed by anyone during his time in the U.S. This is evidenced by the fact that he was not compensated for anything he did during his stay in Hawaii. He was never put on payroll, granted employee benefits, and was never affiliated with Maui Hope. Maui Hope was not even contracted as a Hawaii Department of Health licensed agency until February of 2022 and had no employees or contracts until then, and it has never had a facility or any residents. Therefore, he was never an employee, whether in fact or in law, and should have never been classified as such by any immigration officer.

60.    In fact, Mr. Hoshimov's stay at the private residence of Ms. Rodgers was entirely within the bounds of his visitor visa status. He used Ms. Rodgers and her husband's private vehicle, but paid the gas himself. Any incidental help he provided to Ian was as a friend, not as an employee, and he was never compensated for this. And while Mr. Hoshimov often had free meals offered to him during his stay, this is because

he was being hosted by Ms. Rodgers and her family, not because he was being compensated as an employee.

61.    If anything, Mr. Hoshimov's conduct falls more readily within the section of 8 C.F.R. § 247a.1(h) that specifically exempts "domestic service in a private home that is sporadic, irregular or intermittent" as unauthorized employment. However, even this form of authorized employment is not an accurate reflection of the nature of Mr. Hoshimov's stay in Hawaii, which was much more akin to a visit with close friends who happen to have a shared bond and shared interests—in this case, the love and care for individuals in need without the motive for compensation.

62.    The consulate's bad faith review of the sworn statement and assertion that Mr. Hoshimov intended to provide false statements amounting to willful misrepresentation of his prior stay is therefore entirely arbitrary, capricious, an abuse of discretion, and not at all in accordance with the law.

**The Challenged Practices**

63.    The Foreign Affairs Manual (FAM) provides detailed guidance to consular officers on how to handle visa applications, including the process for visa refusals. The FAM instructs consular officers to ensure that visa refusals are backed by a factual basis.

64.    Detailed Explanation. Consular officers are required to provide a detailed explanation of the factual basis for the visa refusal. 9 FAM 504.11-3(A)(1)(a)(2); 9 FAM

504.11(A)(1)(g)(3). This means specifying the particular facts and circumstances that led to the decision, rather than providing a vague or generalized reason.

65.    <u>Legal Grounds</u>. The explanation must clearly identify the specific section of the INA or other relevant legal provisions that form the basis for the refusal. 9 FAM 504.11-3(A)(1)(a)(2). This helps applicants like Mr. Hoshimov and his undersigned counsel understand the legal grounds on which their application was denied.

66.    <u>Documentation</u>. Officers must document the factual basis for the refusal in the case file. 9 FAM 504.11(A)(1)(g)(3). This includes recording the facts that support the decision and any relevant evidence or documentation that was considered during the adjudication process. 9 FAM 504.11-3(A)(1)(a)(2).

67.    <u>Written Notice</u>. The FAM mandates that applicants like Mr. Hoshimov must be given a written notice of the refusal, which includes the specific reason for the denial and the section of the law that applies. 9 FAM 504.11-3(A)(1)(a)(2). This notice should be clear and concise, allowing the applicant to understand the basis for the decision and, if applicable, what steps might be taken to overcome the refusal.

68.    <u>Consistency and transparency</u>. Consular officers are instructed to ensure that their decisions are consistent with the guidelines and principles outlined in the FAM. Transparency in the decision-making process is emphasized to maintain the integrity and fairness of the visa adjudication process. 9 FAM 504.11-3(A)(1)(a)(2); 9 FAM 504.11(A)(1)(g)(3).

69.    <u>Review and Reconsideration</u>. The FAM provides guidelines for applicants, including Mr. Hoshimov, to request a review or reconsideration of the decision. This process allows applicants to present new evidence or clarify misunderstandings that may have led to the refusal.

70.    But, despite what the FAM states, the consular officers in Mr. Hoshimov's case totally ignored their duties as consular officers and refused to follow the FAM. In addition, the officers have errantly relied on an earlier, deficiently-executed sworn statement—one where the interviewing officers at the border specifically did not find inadmissibility under INA § 212(a)(6)(C)(i)—in order to find Mr. Hoshimov inadmissible.

71.    In doing so, the interviewing officers' failure to provide a substantive explanation and to consider additional evidence upon Mr. Hoshimov's request indicates a procedural deficiency. It suggests that the consular officers did not adhere to the internal guidelines established by the FAM.

72.    In this case, the U.S. Embassy has refused to engage in any meaningful dialogue or reconsideration, despite the number of times representing counsel has initiated. There simply is a lack of a substantive explanation for Mr. Hoshimov's visa denial. On or about January 16, 2024, the U.S. Embassy in Dushanbe merely responded to Mr. Hoshimov's inquiry through a congressional representative with a bare statement confirming the denial of his visa on the basis of INA § 212(a)(6)(C)(i).

The Embassy could have reached out to Mr. Hoshimov or undersigned counsel more

substantively and much sooner.

**Consular Nonreviewability Does Not Apply**

73.    It should also be noted that while *Kleindienst v. Mandel*, 408 U.S. 753 (1972)

establishes that consular decisions are generally not subject to judicial review if made

on a "facially legitimate and bona fide" basis, consular officers are not exempt from

following internal procedures and regulations. Put another way, the doctrine does not

apply when a visa denial is in bad faith. *Kerry v. Din*, 576 U.S. 86, 105 (2015)(Kennedy,

J., concurring).

74.    Justice Kennedy's concurring—and controlling—opinion in *Kerry v. Din*

lays out a two-part test for determining whether the denial of a visa satisfies the

"facially legitimate and bona fide reason" standard first articulated in *Kleindienst v.

Mandel. See Also Cardenas v. United States*, 826 F.3d 1164, 1171 (9th Cir. 2016) (explaining

why Justice Kennedy's concurrence is the controlling opinion).

75.    First, the consular officer must deny the visa under a valid statute of

inadmissibility. *Din*, 576 U.S. at 103-105 (consular officer's citation to § 1182(a)(3)(B)

"suffices to show that the denial rested on a determination that Din's husband did not

satisfy the statute's requirements" and "the Government's decision to exclude an alien

it determines does not satisfy one or more of [the statutory conditions for entry] is

facially legitimate under *Mandel*").

76.    Second, the consular officer must cite an admissibility statute that "specifies discrete factual predicates the consular officer must find to exist before denying a visa," or there must be a fact in the record that "provides at least a facial connection to" the statutory ground of inadmissibility. *Id.*, at 105.

77.    Bad faith is established where the consular officer acts on information that he or she knows to be false. *Khachatryan v. Blinken*, 4 F.4th 841, 852-53 (9th Cir. 2021); *cf. Gate Guard Services, L.P. v. Perez*, 792 F.3d 554, 561 n.4 (5th Cir. 2015) ("Bad faith implies that a litigant intentionally took a position he subjectively knew was unfounded."). Bad faith can also be established if the applicant "had presented strong evidence of innocence that the consular offer refused to consider." *Yafai v. Pompeo*, 912 F.3d 1018, 1022 (7th Cir. 2019) (*quoting Morfin v. Tillerson*, 851 F.3d 710, 712-13 (7th Cir. 2017).

78.    Here, the consular officer's finding of fraud or willfully misrepresenting a material fact is in bad faith. Under 9 FAM 302.9-4(B)(3), consular officers are required to have specific and substantial evidence to support a finding of fraud or misrepresentation. The officer must document the basis for the finding in detail, including the specific facts and evidence that led to the conclusion.

79.    The interrogating officers at the border ***never*** found Mr. Hoshimov as being untruthful or holding back information. In fact, they lauded his honesty and refused to put a finding of fraud against him. Rather, they encouraged him to apply for an employment visa so that there would be no future issues in his case. However, the

consular officers went right above the actions of the interrogating officer and found Mr. Hoshimov liable for willful misrepresentation even though this was not on his record and even though the interrogating officers at the border refused to give him the same!

80.     The consular officer's failure to support the finding that Mr. Hoshimov committed fraud or misrepresentation with specific and substantial evidence and not providing him an opportunity to rebut these allegations, contravenes the FAM. According to FAM 504.11-3A(g)(3), the consular officer should have considered any additional evidence provided by Mr. Hoshimov and offered a follow-up in-person interview. The lack of adherence to these requirements indicates a procedural deficiency that prejudices Mr. Hoshimov's rights and undermines the principles of due process.

**FIRST CLAIM FOR RELIEF**
**Violation of the Accardi Principle and the Administrative Procedures Act for Agency Action that is Arbitrary and Capricious, an Abuse of Discretion, and Not in Accordance with Law**
**5 U.S.C. §§702**

81.     Plaintiff incorporates by reference all preceding paragraphs as though set forth fully *herein*.

82.     The *Accardi* doctrine requires that agencies follow their own regulations, policies, and procedures. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

83.     Under the Administrative Procedure Act, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … without observance of procedure required by law…" 5 U.S.C. § 706(2).

84.     The U.S. Embassy did not follow the required procedure in adjudicating Mr. Hoshimov's nonimmigrant visa application, and the consulate violated Department of State policy in several aspects.

85.     Consular officers blatantly refused to follow the Foreign Affairs Manual, a/k/a "FAM." The FAM provides detailed guidance to consular officers on how to handle visa applications, including the process for visa refusals. The FAM instructs consular officers to ensure that visa refusals are backed by a factual basis.

86.     Consular officers are required to provide a detailed explanation of the factual basis for the visa refusal. 9 FAM 504.11-3(A)(1)(a)(2); 9 FAM 504.11(A)(1)(g)(3). This means specifying the particular facts and circumstances that led to the decision, rather than providing a vague or generalized reason.

87.     The explanation must clearly identify the specific section of the INA or other relevant legal provisions that form the basis for the refusal. 9 FAM 504.11-3(A)(1)(a)(2). This helps applicants like Mr. Hoshimov and his undersigned counsel understand the legal grounds on which their application was denied.

88.     Officers must document the factual basis for the refusal in the case file. 9 FAM 504.11(A)(1)(g)(3). This includes recording the facts that support the decision

and any relevant evidence or documentation that was considered during the adjudication process. 9 FAM 504.11-3(A)(1)(a)(2).

89.     The FAM mandates that applicants like Mr. Hoshimov must be given a written notice of the refusal, which includes the specific reason for the denial and the section of the law that applies. 9 FAM 504.11-3(A)(1)(a)(2). This notice should be clear and concise, allowing the applicant to understand the basis for the decision and, if applicable, what steps might be taken to overcome the refusal.

90.     Consular officers are instructed to ensure that their decisions are consistent with the guidelines and principles outlined in the FAM. Transparency in the decision-making process is emphasized to maintain the integrity and fairness of the visa adjudication process. 9 FAM 504.11-3(A)(1)(a)(2); 9 FAM 504.11(A)(1)(g)(3).

91.     The FAM provides guidelines for applicants to request a review or reconsideration of the decision. This process allows applicants to present new evidence or clarify misunderstandings that may have led to the refusal.

92.     Here, the consular officers ignored their duties as consular officers and refused to follow the Department of State's own policies and regulations in that they failed:

   (a) to document the factual basis for a visa refusal and specificity. 9 FAM 504.11-3(A)(1)(a)(2). This includes detailing the particular facts and circumstances that led to the decision to refuse the visa.

(b) to make thorough case notes that outline the evidence and rationale behind the decision. 9 FAM 504.11-3(A)(1)(a)(2). These notes should have be sufficiently detailed to justify the refusal and must be communicated to Mr. Hoshimov. Maui Hope and Mr. Hoshimov were only able to ascertain the details of his denial through multiple inquiries to government agencies and through congressional representatives.

93.    The U.S. Embassy failed to meaningfully interview Mr. Hoshimov, failed to reassess its findings despite the number of times Maui Hope and Mr. Hoshimov's attorneys tried to communicate. The U.S. Embassy's actions in this case contravened the "policy of the U.S. Government … to facilitate and promote legitimate international travel…" 9 FAM 402.2-2(F)(a). The Embassy did not comply with "the policy of the U.S. Government to give the applicant every reasonable opportunity to establish eligibility to receive a visa." 9 FAM 306.2-1. And it cannot be said that the consular officer took "[a]ll necessary administrative steps … [to] facilitate legitimate travel to the United States." 9 FAM 403.2-2.

94.    The regulations and binding policies Defendants disregarded in adjudicating Mr. Hoshimov's visa were promulgated for the benefit of visa applicants.

95.    Defendants' violation of these regulations and policies prejudiced Maui Hope and Mr. Hoshimov.

### SECOND CLAIM FOR RELIEF
**Violation of the Administrative Procedures Act for Agency Action Exhibiting Bad Faith**

96.    Plaintiff Maui Hope incorporates by reference all preceding paragraphs as though set forth fully *herein*.

97.    This cause of action arises under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), which mandates that a reviewing court must "hold unlawful and set aside agency actions, findings, and conclusions found to be… arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law."

98.    The actions of the Defendants, specifically the consular officers at the Dushanbe Embassy, were in bad faith, arbitrary, capricious, and not in accordance with the law or the Department of State's own policies as outlined in the FAM.

99.    The consular officers' decision to deny Mr. Hoshimov's visa application was made without a legitimate factual basis and ignored substantial evidence presented by Mr. Hoshimov himself that contradicted the grounds for the alleged fraud or misrepresentation. This disregard for evidence and failure to engage in meaningful communication with Mr. Hoshimov or his counsel demonstrates a bad faith refusal to properly consider his application.

100.    Moreover, the denial of the visa without a substantive explanation indicating fraud or misrepresentation further evidences the consular officers' bad faith. This unexplained and unjustified action deprived Mr. Hoshimov (and by extension Plaintiff Maui Hope) of a fair process and the opportunity to rectify or challenge the basis for denial.

101.    The consular officers' actions have caused significant harm to Plaintiff Maui Hope by arbitrarily denying it the world-class expertise Mr. Hoshimov would bring in this role, without any bona fide justification.

102.    Therefore, the conduct of the consular officers at the Dushanbe Embassy constitutes a violation of the APA, as it was executed in bad faith, was arbitrary, capricious, and abuse of discretion, and not in accordance with the law or established procedures.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Maui Hope respectfully requests the Court to grant the following relief:

A.    Assume jurisdiction over this matter.

B.    Hold that the U.S. Embassy did not follow the necessary procedure in adjudicating Mr. Hoshimov's nonimmigrant visa application, to his and Plaintiff's detriment, and therefore violated the *Accardi* principle;

C.    Vacate the April 4, 2023, visa denial;

D.    Remand the matter to the U.S Embassy in Dushanbe for further consideration and the entry of a new decision that gives full and thorough consideration to Mr. Hoshimov's eligibility for this benefit, ensuring that all evidence provided by Mr. Hoshimov is duly considered and that he is given a fair opportunity to present his case as needed;

E.    Award to Plaintiff attorneys' fees, costs, and interest pursuant to 29 U.S.C. §794(a) and 28 U.S.C. § 2412.

F.    Grant all further relief the Court deems equitable and proper under the circumstances.

**DATED:** March 4, 2025

Respectfully submitted,

<u>On behalf of</u>:
Plaintiff Maui Hope
Ms. Andrea Rodgers
Mr. Shavkat Hoshimov

_____
Timothy A. Gambacorta
Attorney at Law